## BRACKEN v. MILNER.

### BRACKEN et al. v. SAME

(Circuit Court, W. D. Missouri, S. D. October 6, 1900.)

Nos. 170, 171.

1. BANKRUPTCY—DEBTS RELEASED BY DISCHARGE—DEFALCATION WHILE ACTING IN FIDUCIARY CAPACITY.

In the provision of Bankr. Act 1898, § 17, subd. 4, which exempts from the debts released by a discharge in bankruptcy debts created by the defalcation of the bankrupt "while acting as an officer or in any fiduciary capacity," the words "fiduciary capacity" embrace only technical trusts, and not those which the law implies from the contract, nor relations merely of general trust and confidence; and one who is intrusted with money of another to be loaned on approved security, and authorized to receive payments of the interest or principal of such loans, and remit the same to the lender, does not receive such payments in a fiduciary capacity, within the meaning of the statute, but merely as an agent, and a claim against him for money so collected, and not remitted, is not within the exemption, but is one from which he is released by a discharge in bankruptcy.

2. SAME.

An agent intrusted with money by his principals, to be loaned on trust deeds or mortgages, who takes a trust deed securing such a loan to himself as trustee, becomes technically a trustee with respect to the property or its proceeds which comes into his hands through a foreclosure of the security, and his failure to pay over such proceeds to the beneficiary, in compliance with the express requirement of the deed, results in a debt created by his defalcation while acting in a "fiduciary capacity," within Bankr. Act 1898, § 17, subd. 4, from which he is not released by a discharge.

3. SAME—DEBT CREATED BY FRAUD.

An agent intrusted with money of his principals to be loaned on real-estate security made such a loan, taking as security a trust deed to his partner as trustee. This deed he afterwards caused to be foreclosed, and bid in the property in his own name, but without paying therefor, and received a deed from the trustee. He made no report of the transaction to his principals, but subsequently conveyed the property away, and retained the proceeds. Held, that the transaction was outside of, and in violation of, his agency, and his liability to his principals resulting therefrom was a debt created by fraud, within the meaning of Bankr. Act 1898, § 17, subd. 4, from which he was not released by a discharge in bankruptcy.

4. LIMITATIONS—FRAUDULENT CONCEALMENT—MISSOURI STATUTE.

Under Rev. St. Mo. 1899, § 4290, which provides that where the commencement of an action is prevented by any improper act of the defend-

ant, limitation shall run only from the time such prevention ceases, limitation does not begin to run against an action to recover from an agent for converting to his own use money and property of his principals, who resided in a distant state, where he fraudulently represented to them in his letters that he had not received such money or property until they discovered the fraud.

At Law. On trial to the court without a jury.

J. T. White and J. P. McCamon, for plaintiffs.
Frank S. Heffernan, for defendant. .

PHILIPS, District Judge. A jury having been waived by the parties, the above-entitled cases were submitted to the court on the evidence, arguments, and briefs of counsel. As they involve practically the same questions of fact and law, they will be considered in one opinion. ,

The plaintiffs for many years past were resident citizens of the state of Ohio. They had known the defendant from his boyhood, and had the utmost confidence in his personal integrity and business capacity. Shortly after the Civil War he located in the city of Springfield, Mo., and plaintiffs, who were partners in the mercantile business, and J. P. Bracken in his individual capacity, made arrangements with the defendant to loan money for them in southwest Missouri, secured by mortgages or deeds of trust on real estate. The defendant was to loan at given rates of interest, and report the description and quality of the land tendered as security to the plaintiffs for their approval. The notes taken for loans were to be executed to the plaintiffs, or whichever of them was making the loan, and the notes and deeds of trust were to be sent by defendant to them. The defendant was to look to the borrowers alone for his commission for services. He was to collect the annual interest for the plaintiffs, and look after the securities and the collections, and remit promptly to the plaintiffs all collections. Beginning back in the 80's plaintiffs sent him money under this arrangement, which they continued to do until some time early in the 90's. In some of the deeds of trust taken by the defendant his name was inserted as trustee, and in some of the loans made by him for plaintiffs other persons were made trustees in the deeds of trust. Beginning perhaps as far back as 1884, payments of annual interest due under the loans were not paid promptly, according to the defendant's reports by letter to the plaintiffs. These delinquencies increased as time wore on, and, upon inquiries made by plaintiffs of the defendant as to the cause thereof, he wrote them various excuses and explanations, making them occasional remittances to quiet their importunities. But matters grew worse, until in 1894 and 1895 the defendant almost ceased to make any replies to plaintiffs' repeated inquiries of him; and in June, 1895, one of the plaintiffs went to Springfield, Mo., to investigate these matters. After pressing the defendant for explanations for two or three days, he admitted that he had collected the moneys sued for in these actions at various times prior thereto, and had appropriated the same to his use in private transactions, with the expectation that some favorable turn would take

place in his fortunes which would enable him to make restitution. The only security he had to offer plaintiffs on his liabilities to them was a piece of real estate in the city of Springfield and 120 acres of land in Marion county, Ark. He executed to J. P. Bracken and O. M. Bracken separate deeds to this property, with the stipulation that the plaintiffs were to hold the deeds for three years, and, if the lands could be sold, part of the proceeds arising therefrom should be paid to certain parties to whom the defendant was obligated, and the residue applied on J. P. & O. M. Bracken's claims. On the property so conveyed, situate in Springfield, Mo., there was an underlying mortgage, and as plaintiffs' attorneys, on investigation, discovered that the mortgage debt was greater than the value of the property, they did not put the deed therefor on record, and when the property was foreclosed under the mortgage it did not realize enough to satisfy the mortgage debt. The three years having elapsed, the whole interest in the Arkansas land vested in J. P. & O. M. Bracken. Other important facts will appear in this opinion.

Some of the claims for damages to the partnership of J. P. Bracken and O. M. Bracken were assigned to J. P. Bracken. His action for damages embraces his claims based on his individual loans and on the interest of O. M. Bracken's claims for damages assigned to him. The action in behalf of J. P. & O. M. Bracken is based on damages resulting from their joint claims. Prior to the institution of these suits, the defendant, Milner, on his voluntary petition, was adjudged a bankrupt. He reported these claims sued on in his schedules as among his liabilities. Having received his final discharge in bankruptcy, he pleaded the same as a release from the claims sued on. He also interposes the plea of the statute of limitations.

The controlling question in this case is the effect of the discharge in bankruptcy on the claims sued for, and involves the construction of subdivision 4, § 17, Bankr. Act, which declares that "a discharge in bankruptcy shall release the bankrupt from all of his provable debts except such as were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." The conduct of the defendant in respect of his stewardship is so reprehensible that at the hearing of this case the inclination of my mind was to hold him liable on all of these claims. But an examination of the rulings of the supreme court on kindred statutes has unsettled these first impressions. The question turns upon the proper construction of the words, "defalcation while acting in any fiduciary capacity."

This question first came before the supreme court in Chapman v. Forsyth, 2 How. 202, 11 L. Ed. 236, under the bankrupt act of 1841. The language of the corresponding provision of that act excepted from the operation of a discharge in bankruptcy "debts created in consequence of defalcation as a public officer, or as executor, administrator, guardian, or trustee, or while acting in any other fiduciary capacity." The case under consideration there was that of a factor who had defaulted in accounting for a balance due his principal. It was held that such person was not acting in a fiduciary capacity;

within the meaning of the statute. This ruling, in subsequent discussions by other courts, has been attempted to be restricted to the particular facts of that case; as in the case of White v. Platt, 5 Denio, 269, which contended that, as the proceeds of a sale made by a factor are not intended to be kept separate and apart from the funds of the agent, but who has permission to use the same "as the exigencies of his business required," the precise fund may not belong to the principal, but the balances are to be accounted for according to the course of dealing. Therefore such relation constitutes only an implied trust, and is to be distinguished from the relation of an agent in whom a special confidence is reposed, to whom is committed a note and the like to be collected, and who fails to remit the proceeds. In such case the argument is that the principal never parts with his title to the note while in the hands of the agent, nor the money in the hands of the agent arising from the collection of a note, which the agent is obliged, without more, to remit to his principal, and that this makes such transaction a special trust. But the language of the court in the Chapman Case combats this contention. The court said that the term "fiduciary capacity" thus construed would "include all debts arising from agencies," and, indeed, all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all of the commercial transactions of the country confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act. "The cases enumerated, 'the defalcation of a public officer,' 'executor,' 'administrator,' 'guardian,' or 'trustee' are not cases of implied, but special, trusts, and the 'other fiduciary capacity' mentioned must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract." The controlling feature of this enumeration is the distinct declaration that "the act speaks of technical trusts, and not those which the law implies from the contract." The argument was that the words, "in any other fiduciary capacity," were to be known by their associates,—executors, administrators, guardians, and trustees,—whose office is essentially that of technical trustees.

The comprehensive purport of this ruling was recognized by Judge Pardee in Fulton v. Hammond (C. C.) 11 Fed. 291, who differentiated the phraseology of the act of 1841 from the corresponding section in the bankrupt act of 1867, which omitted from the context the words "executor, administrator, guardian, and trustee," and employed the general term, "while acting in any fiduciary character." The argument of the learned judge was that, as the conclusion of the supreme court in the Chapman Case was largely influenced by the association of the words, "fiduciary capacity," with the words, "executor, administrator, guardian, and trustee," the omission of the latter words from the act of 1867 indicated an intention to enlarge the comprehension of the term, "in any fiduciary capacity." Accordingly he held that an agent who obtained possession of a note

for collection, and appropriated the proceeds to his own use, was not released therefrom by a discharge in bankruptcy.

But in the case of Neal v. Clark, 95 U. S. 704, 24 L. Ed. 586, which arose under the act of 1867, the court held that the term "fraud" was designated by its association with the term "embezzlement," and was employed in the statute of 1867 in the same sense as in the statute of 1841, and meant positive fraud, involving moral turpitude, as distinguished from implied fraud, arising from passive conduct, which equity created. After quoting the language, supra, in Chapman v. Forsyth, the court observed: "A like process of reasoning may be properly employed in construing the corresponding section of the act of 1867.".

The question again came before the supreme court under the act of 1867, in Hennequin v. Clews, 111 U. S. 676, 4 Sup. Ct. 576, 28 L. Ed. 565, in which it is noted (pages 680, 681, 111 U. S., page 578, 4 Sup. Ct., and page 567, 28 L. Ed.) that some of the courts had taken the view of that act that "agents, factors, commission merchants, etc., acted in a fiduciary character, on the view that the act was conceived in broader and more general terms than the act of 1841"; while another class took the view "that the act of 1867 used the phrase, 'acting in a fiduciary character,' in the sense which it had received by construction in the act of 1841." After enumerating those diverse authorities, the court said: "We have examined these cases, and others bearing on the subject, but do not deem it necessary to refer to them more particularly, inasmuch as the question has recently been fully considered by this court, and the decision in Chapman v. Forsyth has been followed."

Among the cases cited by the court as holding the latter view is that of Cronan v. Cotting, 104 Mass. 245, in which it was distinctly held that the term, "in any fiduciary character," in the act of 1867, was employed by congress in the same sense, and with the same application, given to it by the supreme court in Chapman v. Forsyth, under the act of 1841. The court said:

"It is true that in the act of 1841 the phrase followed an enumeration of certain trusts of a marked character, and the association was regarded as an indication of the intent of congress in the use of that phrase. But that intent having been ascertained and declared by a judicial construction of the act, the language thenceforth bore a legal significance, in accordance with that construction. When the same, or substantially the same, language was subsequently used, for a similar purpose, in the bankrupt act of 1867, it is to be presumed that it was so used in view of the construction and legal import which had become attached to it by the interpretation of the proper constitutional tribunal."

The court further said that:

"The inference is quite as legitimate that congress omitted the enumeration of specific trusts, for the very reason that the term 'fiduciary capacity' had, by judicial construction, received a fixed definition, and with intent that the phrase should carry that definition into the new act. The specific enumeration was omitted because all were included in the general expression 'fiduciary.'"

This reasoning seems to me to be conclusive.

The supreme court in Hennequin v. Clews, supra, applied the construction given by it under the act of 1841 to the term "fiduciary

capacity" to the term "fiduciary character" employed in the act of 1867, and held that where A. hypothecated with B. securities which had been pledged to him to secure the obligation of another, and, failing to return them when such obligation was discharged, did not thereby create a debt by fraud or in a fiduciary capacity which was exempt from the operation of a discharge in bankruptcy, he held the security under a contract to return it when the purpose had been subserved, but his office was not that of a trustee under a technical trust.

So the supreme court of Massachusetts in the Cronan Case, supra, held that the term "fiduciary character" did not include the obligation of a creditor, to whom the debtor delivered the property in pledge, with directions to sell and apply the proceeds in satisfaction of the debt, and to pay over to the debtor the balance remaining after such satisfaction. The court said:

"We are inclined to the opinion that the phrase implies a fiduciary relation existing previously to, or independently of, the particular transaction from which the debt arises. * * * The debt, in this case, arose exclusively out of a single transaction between the parties. Its creation involved no element other than that of contract. The existence of the liability did not spring from any breach of trust. * * * The debt did not result from, but preceded, that default."

In Upshur v. Briscoe, 138 U. S. 365, 11 Sup. Ct. 313, 34 L. Ed. 931, the court reviewed the decisions construing the phrase "fiduciary capacity" in the act of 1867, and readopted the language of the court in Chapman v. Forsyth. The court again asserted that, "within the meaning of the exception, a debt is not created by a person while acting in a 'fiduciary character,' merely because it is created under circumstances in which trust or confidence is reposed in the debtor, in the popular sense of those terms." The court quoted with approval the foregoing language of the supreme court of Massachusetts in the Cronan Case.

Judge Brown, in Re Basch (D. C.) 97 Fed. 761, has applied the same construction to the term "fiduciary capacity" under the present bankrupt act, and held that a debt due by the bankrupt in the character of a commission merchant, arising out of his failure to account for the value of goods consigned to him for sale on commission, on a contract to return the goods or their specific proceeds, is not a debt created by the bankrupt's "fraud, embezzlement, misappropriation, or defalcation while acting in a fiduciary capacity," and was therefore released by his discharge in bankruptcy.

Applying these authoritative principles to this case, what was the character of Milner in respect of his default in failing to remit the moneys collected by him in those cases, where the collections were not made under foreclosure of the deeds of trust in which he was trustee? In such case his authority to collect did not arise from any provisions or recitations in the deeds of trust, but simply by virtue of his agency under the contract to collect the interest and principal, and remit the same to the plaintiffs. Was there any more special trust and confidence reposed in him than that reposed by any principal in the agent selected to take his money for invest-

ment in approved securities, look after the same, and attend to the collections for him? He was simply under contract obligation to remit as fast as collected. The defendant did not misapply the money sent him. He loaned it on approved securities. His default arose on failure to remit, as a mere agent, in some of the cases sued on. The court, therefore, holds that in respect of the collections made by the defendant independently of his trusteeship in the deed of trust, and in the absence of positive fraud, his liability therefor is released by his discharge in bankruptcy.

A different question arises in the instance where the defendant was trustee in some of the deeds of trust, which he of his own motion foreclosed, and appropriated the money arising from the sales. He did not report to plaintiffs, or either of them, the facts of such sales and the receipt of the money arising therefrom. On the contrary, he concealed these facts from the beneficiaries in the deeds of trust, and led them, by his letters, to believe that the debtors were delinquent, and the deeds of trust were in force. He had himself made trustee in certain of the deeds of trust, and thereby accepted the office. As such he was trustee of an express trust, and was therefore acting under a technical trust created by an instrument of writing. His duties as such trustee were clearly defined by the instrument, which empowered him to sell the mortgaged premises, in case of default, to the highest bidder, for cash, at public vendue; and on the payment of the purchase money he was to "receive the proceeds of sale, out of which shall be paid, first, the cost and expenses of this trust, and, next, all amounts expended as aforesaid, for taxes and other purposes, with interest as above mentioned, and, next, the amount that may remain unpaid on said note and interest thereon; * * * and the said party of the second part [the defendant] covenants faithfully to perform and fulfill the trust herein created." He received the money under the foreclosure sales as a technical trustee, and was bound by his office as such to pay over to the cestui que trust "the amount that may remain unpaid on said note." In other words, he received such money while acting, in the strictest sense, in a "fiduciary capacity." His liability, therefore, on these causes of action is not released by his discharge in bankruptcy. In this category are the collections made by him under the deeds of trust given by Giles P. Newbill and George B. Ramsay. While he was trustee under the deed of trust given by Jeffries, his collection of the debt thereby secured was not as trustee by foreclosure. It was paid to him voluntarily by Jeffries as the recognized agent of the plaintiffs, and therefore comes within the class of cases first discussed in this opinion.

A different question is presented in respect of what is known as the Neighbors transaction. On February 16, 1881, the defendant loaned for the two Brackens the sum of $550 to W. D. Neighbors, secured by a deed of trust on real estate, executed to John W. Lisenby as trustee. This deed of trust he caused to be foreclosed by the trustee, and at the sale thereunder, on the 28th day of July, 1882, he bid the land in in his own name at the price of $500. But for some unexplained reason the trustee's deed was not made to

him until the 23d day of February, 1889. There is no pretense that the defendant paid the $500 to the trustee. This dealing he never reported to plaintiffs, but persistently kept the fact concealed from them, and led them to believe that the deed of trust continued in force until the visit of one of the plaintiffs, in June, 1895, when he stated that he had "traded the land off" in 1887 or 1888. What he got in exchange does not appear. This transaction was clearly outside of his agency. Conceding that it was permissible, for properly guarding the interest of his principals, to bid the land in at trustee's sale, he should have done so in their name, and had the deed made to them; or, having bidden it in in his own name, he should have reported the transaction to plaintiffs, and sent them the $500, subject to their approval. This whole transaction is further characterized by the fact that Lisenby, trustee in the deed of trust, was at the time the defendant's partner in business. Therefore the transaction stands, in its moral aspects, little different from its legal effect had the defendant's own name been inserted as trustee. The result is that plaintiffs lost their security and the money. The thing, whatever it was, he got in exchange for the land, is gone, so that the plaintiffs are unable to fix upon it an equitable lien. The property did not come into his hands as agent, but in violation of his duty as agent. The whole manner of depriving plaintiffs of their security and money was mala fides, a gross and positive fraud, within the meaning of the term "fraud" employed in section 17, subd. 4, of the bankrupt act, and defendant's liability for damages resulting therefrom is not released by his discharge in bankruptcy.

In respect of the statute of limitations pleaded by defendant in these actions, it is sufficient to say that under section 4290, Rev. St. Mo. 1899. it is provided that "if any person, by absconding or concealing himself, or by any other improper act, prevent the commencement of an action, such action may be commenced within the time herein limited after the commencement of such action shall have ceased to be so prevented." As already shown, this defendant did not only conceal from the plaintiffs the fact of his having collected this money while they were residing in a distant state, but by his letters and whole conduct he purposely led them to believe that the debts had not been collected or the mortgages foreclosed. In such case the plaintiffs had five years in which to bring the action after the discovery of the fraud. The discovery was not made until June, 1895, and the suits were brought in March, 1900.

The defendant is entitled, on the accounting, to a credit for the value of the Arkansas land, estimated at the time when the three-years condition expired, which would have been in August, 1898. The evidence touching the value of this land is quite meager. It is rugged, unimproved land. A letter in evidence from the defendant to plaintiffs, stating to them that he could furnish them a purchaser therefor at $2.50 an acre, virtually recommending its acceptance, indicates that he did not regard it of greater market value. The only other evidence touching this issue was the statement that the plaintiffs had asked $10 an acre for the land. Dealing most liber-

104 F.—34

ally with the defendant, the court will fix the value of said land at $5 an acre, which would amount to $600.

The only remaining question, then, is as to where this credit should be placed. As the deed was made to J. P. & O. M. Bracken, the credit should go on their joint claims against the defendant, and, on equitable principles, should be applied to the first default, and therefore the court applies it to the claim arising on the Neighbors transaction. Judgment will go against the defendant for the amount of the defalcation on the Ramsay and Newbill debts, and for the balance due on the Neighbors debt, after allowing a proper credit for the Arkansas land